LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Telephone: (702) 382-1170
Fascimile: (702) 382-1169

Proposed Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| In re:<br><br>NW VALLEY HOLDINGS LLC,<br><br>Debtor. | Case No.: BK-S-15-10116-abl<br>Chapter 11<br><br>Date: February 25, 2015<br>Time: 1:30 p.m. |
|---|---|

**DECLARATION OF CHARLES C. REARDON IN SUPPORT OF APPLICATION FOR ORDER APPROVING: (I) THE EMPLOYMENT OF ASGAARD CAPITAL, LLC AS MANAGER OF THE DEBTOR PURSUANT TO 11 U.S.C. § 363 *NUNC PRO TUNC* TO THE PETITION DATE; AND (II) CHARLES C. REARDON AS DEBTORS' DESIGNATED REPSONSIBLE PERSON**

I, Charles C. Reardon, hereby declare as follows:

1. I am over the age of eighteen and am mentally competent. I have personal knowledge of the matters set forth herein, except where stated upon information and belief, and if called upon to testify, could and would do so consistent herewith. I made this Declaration in support of the *Application for Order Approving: (i) the Employment of Asgaard Capital, LLC as Manager of the Debtor Pursuant To 11 U.S.C. § 363 Nunc Pro Tunc to the Petition Date; AND (ii) Charles C. Reardon as Debtor's Designated Responsible Person* (the "Application").[1]

---

[1] Unless otherwise indicated, all capitalized terms herein shall have the same meaning as set forth in the Application.

2. The Application requests court approval, to the extent necessary, pursuant to section 363(b) of title 11 of the United States Code (the "Bankruptcy Code") to employ and retain Asgaard Capital, LLC ("Asgaard") to provide the services of myself, a Senior Managing Director of Asgaard, and other Asgaard personnel, pursuant to the Engagement Letter, *nunc pro tunc* to the Petition Date. The Application also requests that I be approved as the Debtor's designated responsible person for its Chapter 11 Case.

3. Pre-petition, Asgaard was appointed as the manager of NW Valley Holdings, LLC, a Nevada limited liability company ("NWVH" or "Debtor" or the "Company").

### Background[2]

4. According to its original operating agreement, the Company was organized on or about February 12, 2004 to provide a vehicle and a process for its managers and members, who were all homebuilders and other property developers, to group together and make a joint bid to acquire certain real property consisting of approximately 1,710.86 gross acres (the "Property") located in the City of Las Vegas, Nevada at a Bureau of Land Management ("BLM") auction held on February 2, 2005, Auction No. N78216 (the "Auction"), and on which they intended to develop a master planned community. Auctions such as the Auction were established by the Southern Nevada Public Lands Management Act (the "Act"), which became law in 2008, and which allowed the BLM to sell public land within a specific boundary around Las Vegas, Nevada. The revenue derived from land sales per the Act was split between the State of Nevada General Education Fund (5%), the Southern Nevada Water Authority (10%), and a special account available to the Secretary of the Interior for parks, trails, and natural areas, and other capital improvements and conservation initiatives.

5. Further, and again as set forth in the original operating agreement, after the Auction and the Company's successful acquisition of the Property, the Company was to formulate a conceptual plan for the development of the Property, obtain necessary approvals and

---

[2] Because Asgaard was only appointed the Debtor's manager as of November 25, 2014, this entire Background section is made upon information and belief only.

authorizations for the subdivision of the Property into individual "pods," to design and install certain infrastructure improvements, and allocate and convey the Property to its members in proportion to their respective membership interests. The Company also provided a mechanism for its members to share the pre-Auction investigation and due diligence costs, and the costs and expenses associated with the conceptual planning and mapping of the Property, the obtaining of entitlements for the Property, the obtaining and recording of a development agreement for the Property, the preparation and recordation of appropriate design and architectural guidelines, and covenants, conditions and restrictions governing the community and the development thereof.

6. The Company's General Manager was initially Holdings Manager, LLC, which in turn was controlled indirectly by John A. Ritter ("Mr. Ritter"). Mr. Ritter is the Founder, Chairman, and Chief Executive Officer of the Focus Property Group.

7. The Company's managers initially included Focus Kyle Group, LLC ("Focus Kyle") and Mr. Ritter, and the following homebuilders: MTH Homes Nevada, Inc./Meritage Homes Corporation, Alameda Investments, LLC ("Alameda")/Woodside Group ("Woodside"), Coleman-Toll Limited Partnership/Toll Brothers, Inc., KB Home Nevada Inc./KB Home, Kimball Hill Homes Nevada, Inc./Kimball Hill, Inc. (collectively, "Kimball Hill"), Lennar Communities Nevada, LLC, n/k/a Lennar Pacific, Inc./Lennar Corporation, PN II, Inc./Pulte Homes, Inc., and Ryland Homes Nevada, LLC/The Ryland Group, Inc. (collectively, the "Managers"). The Managers were also members holding various percentage interests in the Company and were allotted acreage in the Property consistent with their percentage interests in the Company.

8. In order to finance its acquisition and development of the Property, the Company obtained a credit facility (the "Loan") pursuant to that certain Credit Agreement (the "Credit Agreement") dated July 20, 2005 with a syndicate of lenders led by Wachovia Bank, N.A., as original administrative agent (as amended from time to time, the "Lender"). The Credit Agreement provided funding in the form of various facilities that, with an amendment dated November 8, 2006, totaled commitments of up to the principal sum of $565,000,000. The Lenders also secured all indebtedness under the Credit Agreement with a recorded deed of trust

1  on the Property, as well as all improvements existing or to be made or constructed thereon. The Managers also executed Completion Guarantys (the "Guarantys") of the indebtedness per the Credit Agreement in favor of the Lender.

9. A few years after the Company acquired the Property at the Auction, the "Great Recession" and financial crisis of 2007-08 hit, and the Company defaulted and lost nearly all of the Property to foreclosure on or about September 23, 2008 for a credit bid of $5,000,000. The Lender thereafter held the Property and all remaining rights in and to the Loan in an entity called KAG Property, LLC ("KAG Property").

10. On October 10, 2008, the Lender filed an action in the U.S. District Court for the Southern District of New York, Case No. 1:08-cv-08681 (the "New York Litigation"), against various of the manager/members of the Company seeking to collect on their Guarantys due to a deficiency from the foreclosure sale of the Property.[3] On December 15, 2008, the Lender also filed an action against the Company in the Eighth Judicial District Court, Clark County, Nevada, Case No. A577758 (the "Nevada Litigation"), which also sought the recovery of a deficiency judgment against the Company for the remaining indebtedness per the Credit Agreement.

11. On February 28, 2011, the Lender, as administrative agent, and acting through Wells Fargo Bank, N.A. as successor by merger to Wachovia ("Wells Fargo"), entered into a Confidential Release, Covenant Not to Sue, Indemnity and Settlement Agreement with various of the homebuilder managers/members in the New York Litigation (collectively, the "Original Settling Homebuilders"), except for Kyle Focus, Mr. Ritter, Woodside/Alameda and Kimball Hill, whereby they settled their disputes with the Lender under the Guarantys for certain settlement payments to the Lender. As a result of these payments to the Lender, the Original Settling Homebuilders were entitled to indemnity and/or contributions claims pursuant to the Company's operating agreement and/or applicable law against the Company and the other non-

---

[3] Kimball Hill filed their respective chapter 11 bankruptcy cases on April 23, 2008 in the U.S. Bankruptcy Court for the Northern District of Illinois, Case No. 08-10095. Similarly, Woodside, along with certain of its affiliates, filed their own respective chapter 11 bankruptcy cases on August 20, 2008, and Alameda filed its own chapter 11 bankruptcy case on January 9, 2009, which cases were all eventually jointly administered under Case No. 6:08-bk-20682 in the U.S. Bankruptcy Court for the Central District of California.

LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd. #101
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

settling members.

12. On or about March 2013, the Company and all of the members/managers thereof (except for Kimball Hill), entered into a Settlement Agreement and Mutual Release with the Alameda Liquidating Trust, as successor to Alameda under its confirmed chapter 11 plan. The foregoing settlement provided for the Company to make a settlement payment to the Alameda Liquidating Trust in exchange for mutual releases of various disputed claims. Additionally, pursuant to the same settlement, the Alameda Liquidating Trust assigned all of its interest in and all rights to the Company to the other members of the Company (other than Kimball Hill), thereby terminating Alameda's involvement in the Company.

13. On May 16, 2014, as later amended on November 10, 2014, the Lender, acting through Kyle Agent, LLC ("Kyle Agent") as successor administrative agent to Wells Fargo,[4] entered into a Confidential Release, Covenant Not to Sue, Indemnity and Settlement Agreement with Focus Kyle and Mr. Ritter, whereby they settled their disputes with the Lender under the Guarantys at issue in the New York Litigation by making certain settlement payments and tendering their interests in and rights to the Company to Kyle Entity Holdings, LLC ("KEH"), thereby terminating Focus Kyle and Mr. Ritter's involvement in the Company.

14. On or about November 10 and 11, 2014, KEH entered into various Purchase and Sale Agreements with the Original Settling Homebuilders, thereby purchasing all of their interests in, and claims and rights to the Company, including but not limited to their claims of indemnity and contribution against the Company and Kimball Hill.

15. As a result thereof, and as of the Petition Date, KEH holds 90.1% of the membership units in the Company as sole voting member, and the Kimball Hill Post-Consummation Trust and/or Liquidating Trust, as successors to Kimball Hill under its confirmed

---

[4] On or about May 24, 2013, Wells Fargo resigned as administrative agent as a result of its selling all of its rights and interests in the Loan, among other matters, to Stonehill Institutional Partners L.P. ("Stonehill"). Stonehill and other lenders thereafter appointed Stonehill's affiliate Kyle Agent as successor administrative agent. Kyle Agent owns KEH and holds indirect ownership in KAG Property and for the benefit of the lenders. Stonehill is a part owner of Kyle Partners, LLC ("Kyle Partners"), which is the owner of approximately 89% of the beneficial interest of any remaining amounts owing, if any, under the Credit Agreement. For the avoidance of doubt, the Debtor asserts that it has been released from any obligations under the Credit Agreement.

chapter 11 plan, holds the remaining 9.59% interest in the Company, albeit as a defaulted and non-voting member in the Company pursuant to the terms of its operating agreement.

16. In November 2014, Holdings Manager resigned as General Manager of the Company, and on November 25, 2014, KEH, as the majority and sole voting member of the Company, appointed Asgaard as the Company's manager.

17. On December 19, 2014, the Company, acting through KEH as majority and sole voting member, filed an amendment to its articles of incorporation, thereby changing its name to NW Valley Holdings, LLC.

18. The Company has no ongoing operations or employees, but rather simply holds various legacy assets not otherwise foreclosed out by the Lender, which assets principally consist of cash on hand and certain small parcels of land located directly underneath or within the right of way of the U.S. Route 95 highway and near Kyle Canyon Road in Las Vegas, Clark County, Nevada.

19. Given the foregoing, including the lengthy and involved history of the Company, and in an effort to bring clear finality to the situation, the Company resolved, with the advice and consent of KEH as majority and sole voting member, to conduct an orderly liquidation of the remaining legacy assets under the control of a neutral, independent manager and under the supervision of the Bankruptcy Court. The Company believes that the bankruptcy process will allow it to provide a forum for the adjudication of any claims and interest in and to the remaining legacy assets, and provide an organized process for the distribution of such remaining assets to the appropriate creditors and parties in interest.

### Qualifications

20. NWVH and Asgaard entered into an Engagement Letter dated as of January 9, 2015, but effective as of November 25, 2014--the date that Asgaard commenced providing its services as manager to NWVH. A true and correct copy of the Engagement Letter is attached hereto as **Exhibit 1**.

21. Asgaard is a boutique, middle-market financial advisory firm based in Tysons Corner, Virginia. I am the founder and Senior Managing Director of Asgaard, and I am an

investment banker and business executive specializing in distressed M&A and turnaround transactions. I have more than 25 years of expertise in directing operational and financial restructurings, healthy and distressed M&A, debt and equity capital financing and real estate development. My extensive experience includes conceptualizing and executing complex commercial, legal and financial transactions with multiple stakeholders and changes in control and capital structures. I have advised public and private companies across a broad spectrum of industries including defense, financial services, hospitality, manufacturing, mining, technology, telecommunications, real estate and retail.

22. Prior to founding Asgaard, I was a Partner in the investment banking division of Carl Marks & Co., a middle-market merchant bank headquartered in New York. Before that, I was a Director with Houlihan Lokey Howard & Zukin and a member of its globally recognized Financial Restructuring Group. I led Houlihan's Distressed Mergers & Acquisitions Practice in the mid-Atlantic region. I began my career on Wall Street with the law firm of Lane & Mittendorf (now Windels Marx Lane & Mittendorf) specializing in corporate finance, general corporate matters, and real estate law.

23. Asgaard recently served as financial advisor to the Official Committee of Unsecured Creditors of Velti, Inc., *In re Velti, Inc., et al.*, Case No. 13-12878 (PJW), Bankr. D. Del. Following the successful sale of those debtors' assets and confirmation of a consensual plan of liquidation, I was appointed as "Responsible Person" for the remaining Velti estates, as well as Litigation Trustee to pursue various claims against former insiders and third parties, on behalf of all unsecured creditors.

24. I hold Series 7, Series 79 and Series 63 licenses with FINRA. I am a member of both the Turnaround Management Association and the American Bankruptcy Institute, and have served on the boards of a number of public and privately held companies. As set forth below, I am also currently serving as a board member for WCI Communities, Inc., a publicly-traded (Ticker: WCIC) Florida-focused home builder. I hold a B.A. with highest distinction from the University of Virginia and a J.D. from Yale Law School.

### Scope of Services

25. Asgaard's services are appropriate and necessary to enable the Debtor to execute its duties as debtor and debtor-in-possession faithfully and to implement a restructuring of the Debtor. This Application proposes that Asgaard be employed as manager to render the following professional services:

    A. Speak and/or meet with personnel affiliated with the Company, its equity holders, creditors, and other relevant parties to familiarize Asgaard with the business, operations, financial condition, and prospects of the Company;

    B. Work with the Company and its counsel to effectuate a wind-down or restructuring of the Company, including:

        i. Help develop an efficient, opportune, and value-maximizing means to complete a wind-down or restructuring;

        ii. Help draft and file the Company's Chapter 11 petition and schedules, including the Debtor's Statement of Financial affairs;

        iii. Attend the initial meeting with the Office of the United States Trustee, the 341 Meeting, and such other hearings or meetings as counsel or the Member reasonably deems necessary or appropriate;

        iv. Work to confirm and effectuate, to the extent feasible and appropriate, a Plan, starting with identifying the interests of creditors, equity holders, and other parties in interest;

        v. File required Monthly Operating Reports;

        vi. Review and assist in the claims reconciliation processes;

        vii. If a Plan cannot reasonably be confirmed or effected, evaluate other options available to the Company to complete a restructuring or wind-down;

        viii. Negotiate the terms and structure of one or more transactions that will result assist implementation of the Plan or other restructuring or wind-down of the Company;

        ix. Assist in, and serve in a management and oversight capacity, in consummating such transaction(s);

    C. If applicable, assist the Company in (or respond to) any litigation matters;

    D. Maintain the books and records of the Company, with the assistance of such personnel of Asgaard or professionals that may be necessary;

  E. If adequate historical records and tax returns are available, then, based on advice and support from the Company's insiders, counsel, and accountants, file tax returns;

  F. Advise and attend meetings of the Company's Members, creditor groups, official constituencies and other interested parties to discuss the restructuring or wind-down, as Asgaard reasonably determines to be necessary or desirable; and

  G. Provide such additional services or assistance as may reasonably be necessary to effectuate the restructuring or wind-down of the Company, subject to the terms and conditions of the Engagement Letter.

  26. The "Jay Alix Protocol" implemented by the Office of the United States Trustee dictates that a manager retained under section 363 identify any of its affiliates who will serve as the Debtor's executives and identify the functions of any staff that will be employed by the Debtor. In compliance with such protocol, Asgaard will be serving as Manager of the Debtor and no principal, employee, or independent contractor of Asgaard or its affiliates will serve as an executive or be employed as a staff member of the Debtor, although some Asgaard parties will be providing services to the Debtor but only through Asgaard, in accord with the terms of the Engagement Letter. If that changes, a motion to modify the employment will be filed. As further required by the "Jay Alix Protocol," no principal, employee, or independent contractor of Asgaard or its affiliates will serve as a director of the Debtor during the pendency of the Debtor's Chapter 11 Case, and, for a period of three (3) years after the conclusion of the engagement, neither Asgaard nor any of its affiliates will make any investments in the Debtor.

  27. I will head the engagement for Asgaard. In addition, if this Application is approved by the Court, then I will serve as the Debtor's "Responsible Person" pursuant to Bankruptcy Rule 9001(5).

## Compensation

  28. Prior to the Petition Date, Asgaard received a security retainer in the sum of $25,000.00 for pre- and post-petition services in connection with the Debtor's restructuring and proposed bankruptcy case. Of this sum, Asgaard billed and was paid the sum of $24,112.00 prior to the Petition Date, and Asgaard currently holds in retainer the remainder sum of $888.00.

  29. As set forth in the Engagement Letter, Asgaard will charge hourly rates for its

services, ranging from $750.00 for myself, $525.00 for Senior Vice Presidents, $250.00 for associates, and $175.00 for analysts. Mr. David Black is set forth in the Engagement Letter at the hourly rate of $525.00, as a Senior Vice President, although he is not an employee of Asgaard but rather an independent contractor who Asgaard will utilize to assist in this engagement. To the extent any other independent contractors junior to or assisting Mr. Black are utilized, their time will be charged to the estate at the lowest rate for professionals under the Engagement Letter, which is $175 per hour.

30. Further, per the Engagement Letter, Asgaard has agreed to cap its fees at a blended hourly rate of $550.00 per hour. In other words, if this engagement requires a great deal of work by myself, at a higher hourly rate than the cap, then the Debtor will benefit. If, on the other hand, the engagement work can be largely done by lower-billing parties, then the Debtor will only be charged such lower amount, and the cap would not be relevant.

31. The foregoing rates are the same or consistent with hourly rates structures charged to other Asgaard clients and approved by other courts, and Asgaard respectfully submits that such rates are reasonable.

32. In addition to the fees described above, the Engagement Letter provides for Asgaard to be reimbursed by the Debtor on a monthly basis for all reasonable, documented, out-of-pocket expenses incurred by Asgaard in connection with providing the services specified in the Engagement Letter. Such expenses include travel, lodging, meals, duplicating, related out-of-pockets costs, messenger charges, and telephone charges, all of which shall be charged at cost. Any application for reimbursement of expenses made by Asgaard will be in accordance with LR 2016 and shall be reviewed under section 330 of the Bankruptcy Code.

33. Asgaard expects to have a nominal amount of fees and expenses of its outside counsel incurred in connection with this engagement. Asgaard has retained the law firm of Bryan Cave LLP to represent it on this engagement, including assisting in the preparation of this Application, preparing or revising fee applications, and addressing any issues raised by the Office of the United States Trustee related to Asgaard's retention as Manager of the Debtor. Bryan Cave represents Asgaard in a similar capacity in bankruptcy proceedings across the nation. Thus,

Bryan Cave can work on these matters very efficiently, as opposed to having unfamiliar counsel work through a description of the engagement, conflicts matters, and the like. In addition, all bills from Bryan Cave LLP shall comply with LR 2016.

### No Adverse Interest or Disqualifying Connections

34. Although not truly applicable here, because this Application is under section 363 and not section 327, Asgaard still performed various conflicts checks and is disclosing connections to ensure that the Court and all parties are appraised of this information. To that end, prior to commencing representation of the Debtor prepetition, the Debtor disclosed to Asgaard its managers, members, officers, directors, shareholders, and creditors to determine any prior or present representation of any creditors or parties-in-interest. From such initial review, up to and including the preparation of this Application, Asgaard has continued to review the information provided by Debtor to determine any previous or present representations of creditors or parties-in-interest.

35. Pursuant to Bankruptcy Rule 2014(a), except as otherwise disclosed herein, Asgaard does not have any connections with the Debtor, its creditors, any other party in interest, their respective attorneys or accountants, the United States Trustee, or any person employed in the Office of the United States Trustee. Moreover, Asgaard has no other relationships that would give rise to an adverse interest to the Debtor's estate.

36. Asgaard will conduct an ongoing review to ensure that no disqualifying circumstances arise, and if any new relevant facts or relationships are discovered, Asgaard will supplement its disclosure to the Court.

37. I currently serve on the board of directors of WCI Communities, a publicly-traded homebuilder based in Florida. I came to serve on the board of WCI Communities as the designee of Stonehill Institutional Partners, L.P. and certain other investors. Stonehill Institutional Partners, L.P. is an affiliate of KEH and Kyle Agent, which are entities in the corporate structure of the Debtor, as set forth above.

### Indemnification

38. The Engagement Letter contains standard indemnification and limitation of

liability language with respect to Asgaard's services. However, such indemnity will in all respects be subject to limits on indemnity of third parties providing services to a debtor, as follows:

(a) Neither Asgaard nor any indemnified party shall be entitled to indemnification, contribution, or reimbursement for services other than the services provided under the Engagement Letter, unless such services and the indemnification, contribution, or reimbursement therefore are provided for in the Engagement Letter and approved by the Bankruptcy Court.

(b) The Debtor shall have no obligation to indemnify Asgaard or to provide contribution or reimbursement to Asgaard for any claim or expense that is either (a) judicially determined to have resulted primarily from the willful misconduct, gross negligence, bad faith or self-dealing of Asgaard; or (b) settled prior to a judicial determination as to Asgaard's willful misconduct, gross negligence, bad faith or self-dealing but determined by the Court, after notice and a hearing, to be a claim or expense for which Asgaard should not receive indemnity, contribution or reimbursement under the terms of the Engagement Letter.

(c) If Asgaard believes that it is entitled to the payment of any amounts by the Debtor on account of the Debtor's indemnification, including without limitation the advancement of defense costs, before the earlier of (a) the entry of an order confirming a chapter 11 plan in this Bankruptcy Case (that order having become a final order no longer subject to appeal) and (b) the entry of an order closing, dismissing or converting this Chapter 11 Case, Asgaard must file an application to this Court seeking such payment, and the Debtor may not pay any such amounts to Asgaard before the entry of an order by this Court approving the payment; *provided*, *however*, that the foregoing is intended only to specify the period of time during which the Court shall have jurisdiction over any request for indemnification by Asgaard, and is not a provision limiting the duration of the Debtor's obligation to indemnify Asgaard.

39. Finally, notwithstanding any provisions of the Engagement Letter to the contrary, Asgaard has agreed not to raise or assert any defense based upon jurisdiction, venue, abstention or otherwise to the jurisdiction and venue of this Court hear or determine any controversy or

claims with respect to, in connection with, arising out of, or in any way related to Asgaard's engagement in the Chapter 11 Case.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 27, 2015.

*[signature]*
CHARLES C. REARDON